1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**WRENN BENDER  LLLP**
Aaron M. McKown, California Bar No. 208781
Paula L. Zecchini, California Bar No. 238731
2 Park Plaza, Suite 550
Irvine, California  92614
Telephone.: (949) 202-5810
Facsimile:   (949) 679-7939
E-Mail:        amckown@wrennbender.com
                    pzecchini@wrennbender.com
                    gtrimarche@wrennbender.com

Attorneys for Defendant
GODADDY.COM, LLC

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

ACADEMY OF MOTION PICTURE
ARTS AND SCIENCES, a California
nonprofit corporation,

                    Plaintiff,

          v.

GODADDY.COM, INC., a Delaware
corporation; GODADDY.COM, LLC, a
Delaware limited liability company,

                    Defendants.

Case No. CV13-08458-ABC (CW)

Assigned to Hon. Audrey B. Collins
Courtroom 680

**REQUEST FOR JUDICIAL NOTICE
IN SUPPORT OF DEFENDANT
GODADDY.COM, LLC'S MOTION
TO DISMISS AND MOTION TO
STRIKE**

Hearing
Date:           February 24, 2014
Time:           10:00 a.m.
Location:      Courtroom 680

## I.    INTRODUCTION

Defendant GoDaddy.com, LLC ("GoDaddy") respectfully requests that pursuant to Rule 201 of the Federal Rules of Evidence, the Court take judicial notice of the materials set forth below in support of GoDaddy's Motion to Dismiss and Motion to Strike:

A.    Order Re: (1) Plaintiff's Motion for Partial Summary Judgment; and (2) Defendants' Motion for Summary Judgment Dated June 21, 2013 (Docket No. 491), *Academy of Motion Picture Arts and Sciences v. GoDaddy.com,* 2:10-cv-03738

B.    Order Re: Defendants' GoDaddy.com, Inc. and Domains by Proxy, Inc.'s Motion to Dismiss First Amended Complaint, or, in the alternative, to Strike Dated December 15, 2010 (Docket No. 68), *Academy of Motion Picture Arts and Sciences v. GoDaddy.com,* 2:10-cv-03738

## II.    LEGAL STANDARD

The Federal Rules of Evidence permit courts to take judicial notice of certain facts if they are "not subject to reasonable dispute." FED. R. EVID. 201(b).  A fact is not subject to reasonable dispute if it "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  *Id.*  Judicial Notice may be taken *sua sponte* or at a party's request. *See* FED. R. EVID. 201(c).  If judicial notice is at a party's request, the court must grant the request if it is "supplied with the necessary information." FED. R. EVID. 201(c)(2).

On a motion to dismiss, the court may take judicial notice of matters of public record outside the pleadings.  *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986). A court may take judicial notice of its own files and of documents filed in other courts.  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice of documents related to a settlement in

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

REQUEST FOR JUDICIAL NOTICE

another case that bore on whether the plaintiff was still able to assert its claims in the pending case); *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) (taking judicial notice of court filings in a state court case where the same plaintiff asserted similar and related claims); *Hott v. City of San Jose*, 92 F. Supp. 2d 996, 998 (N.D. Cal. 2000) (taking judicial notice of relevant memoranda and orders filed in state court cases). *Cf. In re Zoran Corp. Derivative Litigation*, 511 F. Supp. 2d 986, 1001 (N.D. Cal. 2007) (declining to take judicial notice of a fact document filed in a wholly unrelated action that involved the same legal principles but involved different parties making different allegations and asserting different claims, theories, and arguments). "[C]ourts routinely take judicial notice of documents filed in other courts . . . to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (citations omitted). "The existence and content of opinions and pleadings are matters capable of accurate and ready determination by resort to official court files that cannot reasonably be questioned." *Bogart v. Daley*, No. CV 00-101-BR, 2001 WL 34045761, at *2 (D. Or. June 28, 2001) (citing Fed. R. Evid. 201(b)(2)).

## III.   ANALYSIS

GoDaddy respectfully requests that the Court take judicial notice of two (2) documents.  These documents fit within the category of orders from other cases in the Central District that were pulled from the Public Access to Court Electronic Records ("PACER") system.   All of the documents meet the requirements for judicial notice.

### A.   Court Files Pulled From PACER Are Judicially Noticeable

PACER is an electronic public access service provided by the federal judiciary that allows users to obtain case and docket information from federal appellate, district, and bankruptcy courts via the Internet. *See* PACER, www.pacer.gov. Several federal district and appellate courts have taken judicial notice of court records available to the public through PACER. *See, e.g.*, *Holder v.*

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

REQUEST FOR JUDICIAL NOTICE

*Holder*, 305 F.3d 854, 866 (9th Cir. 2002) (taking judicial notice of California Court of Appeal opinion and briefs found on PACER); *C.B. v. Sonora Sch. Dist.*, 691 F.Supp.2d 1123, 1138 (E.D. Cal. 2009) (taking judicial notice of court records available through PACER).   Here, the court filings pulled from the matter of *Academy of Motion Picture Arts and Sciences v. GoDaddy.com,* 2:10-cv-03738, which is currently pending in the Central District and before this Court were pulled from PACER, which is a source whose "accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)**.**   Finding a document in the PACER system establishes beyond reasonable dispute that the particular document was filed in litigation before a particular court.   Accordingly, the court may take judicial notice of the fact that the documents filed on PACER (1) are accurate copies of the court documents they purport to be, and (2) were filed in the course of litigation in a particular court.

**IV.   CONCLUSION**

     In light of the foregoing, GoDaddy respectfully requests the Court grant its request for judicial notice and consider the above-referenced documents in ruling on its Motion to Dismiss and Strike.

Dated:  January 27, 2014

               **WRENN BENDER LLLP**
Aaron M. McKown
Paula L. Zecchini
Gregory D. Trimarche


By:  */s/ Aaron McKown*
        Aaron M. McKown
Attorneys for Defendant
GODADDY.COM, LLC

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614

4

# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ACADEMY OF MOTION PICTURES ARTS AND SCIENCES, a California Non-Profit Corporation; | CV 10-3738 ABC (CWx) |
| | ORDER RE: |
| Plaintiff, | (1) PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; and |
| v. | |
| GODADDY.COM, INC., a Delaware Corporation; THE GODADDY GROUP, INC., a Delaware Corporation, DOMAINS BY PROXY, INC., a Delaware Corporation, GREENDOMAINMARKET.COM, an unknown entity; BDS, an unknown entity; XPDREAMTEAM, LLC, a California Limited Liability Corporation; | (2) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| Defendants. | |

Pending before the Court are a Motion for Partial Summary Judgment, docket no. 430, filed by Plaintiff Academy of Motion Pictures Arts and Sciences ("Academy"),and a Motion to for Summary Judgment, docket no. 341, filed by Defendants GoDaddy.com, Inc., and Domains By Proxy, Inc. ("GoDaddy"). The parties filed Oppositions and

Replies as to both Motions.  The Court finds the Motions appropriate for resolution without oral argument.  For the reasons below, the Court **GRANTS in part and DENIES in part** the Motions.

## I.  BACKGROUND

In this action, the Academy is suing GoDaddy for (1) Violation of the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d); (2) Unfair Conduct in Violation of California Business & Professions Code § 17200; (3) Unlawful Conduct in Violation of California Business & Professions Code § 17200; and (4) Contributory Cybersquatting.  See Second Amended Compl. ("SAC"), filed October 27, 2011 (docket no. 170).

The Academy claims that, through GoDaddy's Parked Pages Service – which consists of the Free Parking Program and the Cash Parking Program – GoDaddy has monetized or attempted to monetize, and therefore "used" and "trafficked in," domain names that are identical, confusingly similar, and/or dilutive of five of the Academy's trademarks, with bad faith intent, in violation of the ACPA.  See, e.g., SAC ¶¶ 35, 44, 53.  The Academy also alleges that GoDaddy has committed contributory cybersquatting because, through its Cash Parking Program, it encourages its registrants to engage in trademark infringement and has not put in place any mechanisms to prevent trademarked domain names from being entered into the Cash Parking Program.  See, e.g., SAC ¶¶ 38-39, 42, 109-110.  The Academy's § 17200 claims derive from its cybersquatting claims.

GoDaddy seeks summary judgment on all claims.  Academy seeks summary adjudication of the following issues: (1) that the Academy's marks are both famous and distinctive; (2) that GoDaddy is not

RJN - Ex. A 7

entitled to the "safe harbor" provision of 15 U.S.C. §
1114(2)(D)(iii); (3) that GoDaddy is liable under the ACPA for (a)
"using" the domain names in its Free Parking and Cash Parking
Programs, and for (b) "trafficking" in the accused domain names; and
(4) that 115 domain names in issue are identical or confusingly
similar to the Academy's marks.  These 115 names are identified in the
list entitled "Domain Names that are Identical or Confusingly Similar.
.. .".  Michaels Decl. Exh. 1 (last three pages).  The parties also
disagree as to whether the Academy's disclosure of domain names after
September 14, 2011 was timely.

## II.  UNDISPUTED FACTS[1]

1.   The Academy is a non-profit "founded for the purpose of advancing
     the motion picture arts and sciences, by promoting cultural,
     educational and technological achievements."  GRSUF 1.

2.   The Academy owns the following registered trademarks: OSCAR;
     OSCARS; OSCAR NIGHT; ACADEMY AWARD; and ACADEMY AWARDS.  GRSUF 2.

3.   GoDaddy is the largest domain name registrar in the world.  ARSUF
     1.

4.   GoDaddy's Parked Pages Program consists of two sub-programs: the
     Free Parking Program and the Cash Parking Program.  Both sub-
     programs monetize domain names.  See e.g. ARSUF 4, 6, 9, and 13.

---

[1]   The Court will refer to the undisputed facts by reference to
the numbers in this list, e.g., "Fact 2."  The citations following
these facts show the source of the undisputed facts.  The citations
are generally to either Academy's Reply Statement of Undisputed Fact
("ARSUF," docket no. 470) or to GoDaddy's Reply Statement of
Undisputed Fact ("GRSUF," docket no. 418).

5.   GoDaddy's Parked Pages Program is distinct from its domain
registration programs.  For example, GoDaddy can register domain
names without enrolling them in the Parked Pages Program or
otherwise monetizing them.  ARSUF 2, 23, 24, 25, 26.

6.   GoDaddy's "Domain Name Registration Agreement" ("DNRA") governs
GoDaddy's relationship with its registrants.  The January 2009
version of the DNRA states, in a section entitled "Parked Page
Service," as follows: "You [the registrant] agree that Go Daddy
may point the domain name or DNS [domain name server] to one of
Go Daddy's or Go Daddy's affiliates web pages, and that they may
place advertising on Your web page and Go Daddy specifically
reserves this right.  Go Daddy also reserves the right to collect
and retain all revenue obtained from such advertising."  ARSUF 6,
27, Michaels Decl. Exh. 3.

7.   The next section of the DNRA also states: "You [the registrant]
agree that Go Daddy may place advertising on Your Parked Page and
Go Daddy specifically reserves this right.  Go Daddy also reserve
[sic] the right to collect and retain all revenue obtained from
such advertising."  Michaels Decl. Exh. 23.

8.   All registrants are bound by the January 2009 DNRA.  ARSUF 43-45.

9.   As such, all registrants registering domain names in the Parked
Pages Program grant GoDaddy the right to point their domain names
to GoDaddy's websites or servers, and to place on the webpages
that resolve from registered domain names advertisements that
generate revenue for GoDaddy whenever an internet user visits the

4

website and clicks on an advertisement.  ARSUF 4 and 6.[2]

10.  A domain name registrant can identify the domain name server where the domain name will be routed so that content resolving from the domain name can be located and viewed online.  GRSUF 9.

11.  Among the registrant's routing options is to route to a "record not found" error message, to a new or existing website, or to GoDaddy's parked page servers.  A registrant can also decline to designate a name server, in which case GoDaddy will designate by default its parked page server.  GRSUF 10-12.

12.  The designation of GoDaddy's parked page servers does not result in the creation of a webpage or any content.  ARSUF GoDaddy's Fact 9; see also GRSUF 14.

13.  Rather, a webpage will only resolve from a domain name whose domain name server is designated to GoDaddy's parked page servers when an internet user types the domain name into the web browser and presses enter.  At that point, a webpage will be created and exist only for the length of time that the internet user keeps the webpage open.  Once the webpage is closed, the parked webpage ceases to exist, and the content is not stored or preserved.  The next time the domain name is entered into a browser, a new page with entirely new content is created.  ARSUF GoDaddy's Fact 10-12; GRSUF 15, 16.

14.  In GoDaddy's Cash Parking Program, registrants pay GoDaddy a fee

---

[2]  GoDaddy purports to dispute elements of facts 6-9.  The Court has reviewed the record and finds that all of these facts are sufficiently supported and not genuinely undisputed.  The Court has also examined GoDaddy's legal argument that the DNRA is too vague to make GoDaddy a licensee of its registrants, and finds the argument utterly meritless for the reasons the Academy presents.  See section IV(B)(3)(a), infra.

RJN - Ex. A 10

1     to allow GoDaddy, through its advertising partner, to place ads

2     on the webpage associated with a domain name, and the revenue

3     generated from that advertising is split among the registrant,

4     GoDaddy, and the advertising partner.  ARSUF 9.

5  15.  GoDaddy does not pay domain name registrants any of the revenue

6     its receives from the advertising placed on webpages resolved

7     from domain names in the Free Parking Program.  ARSUF 13.

8  16.  The advertisements on webpages resolved from domain names in the

9     Parked Pages Program are either GoDaddy banner ads or ads that

10     are contextual to the domain name.  ARSUF 10.

11  17.  GoDaddy creates and hosts the webpages to which domain names in

12     the Parked Pages Program that have not been designated a

13     different domain name server resolve, places content

14     (advertisements) on those webpages, and generates revenue

15     whenever an internet user clicks on that content.  ARSUF 31.

16

17        **III.  LEGAL STANDARD FOR SUMMARY JUDGMENT**

18     "The court shall grant summary judgment if the movant shows that

19 there is no genuine dispute as to any material fact and the movant is

20 entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The

21 moving party has the burden of demonstrating the absence of a genuine

22 issue of fact for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

23 242, 256 (1986).

24     Once the moving party satisfies its initial burden, the adverse

25 party must set forth specific facts showing that there is a genuine

26 issue for trial.  <u>S. Cal. Gas Co. V. City of Santa Ana</u>, 336 F.3d 885,

27 888 (9th Cir. 2003) ("[The non-moving party] can defeat summary

28 judgment by demonstrating the evidence, taken as a whole, could lead a

6

1  rational trier of fact to find in its favor.") (citations omitted).

2      Both the moving party and the adverse party must support their

3  factual positions by "citing to particular parts of materials in the

4  record . . . or . . . showing that the materials cited do not

5  establish the absence or presence of a genuine dispute, or that an

6  adverse party cannot product admissible evidence to support the fact."

7  Fed. R. Civ. P. 56(c)(1).

8      An issue of fact is genuine if it reasonably can be resolved in

9  favor of either party.  Anderson, 477 U.S. at 250-51.  "[A] district

10 court is not entitled to weigh the evidence and resolve disputed

11 underlying factual issues."  Chevron Corp. v. Pennzoil Co., 974 F.2d

12 1156, 1161 (9th Cir. 1992).  Rather, "the inferences to be drawn from

13 the underlying fact. . . must be viewed in the light most favorable to

14 the party opposing the motion."  United States v. Diebold, Inc., 369

15 U.S. 654, 655 (1962).

16     However, the court must view the evidence presented "through the

17 prism of the substantive evidentiary burden."  S. Cal. Gas Co., 336

18 F.3d at 254.  "[M]ere disagreement or the bald assertion that a

19 genuine issue of material fact exists" does not preclude summary

20 judgment.  Harper v. Wallingford, 877 F.2d 728, 731 (9th Cir. 1989).

21 The "existence of some alleged factual dispute between the parties

22 will not defeat an otherwise properly supported summary judgment

23 motion; the requirement is that there be no genuine issue of material

24 fact."  Anderson, 477 U.S. at 247-48 (emphasis in original).  "The

25 mere existence of a scintilla of evidence in support of the

26 [non-movant's] position will be insufficient; there must be evidence

27 on which the jury . . . could find by a preponderance of the evidence

28 that the [non-movant] is entitled to a verdict . . . ."  Anderson, 477

7

U.S. at 252.  The "opponent must do more than simply show there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## IV.  DISCUSSION

Although the parties' cross-motions are not entirely co-extensive, they make many of the same arguments.  The Court will first address the preliminary question of whether the Academy's disclosure of names after September 14, 2011 was timely.  The Court will then address the issues as to which the Academy seeks summary adjudication, and then separately address issues unique to GoDaddy's Motion that are not disposed of by the rulings on the Academy's Motion.

**A.   The Academy's Disclosure of Domain Names After September 14, 2011 was Untimely.**

In the Court's initial Scheduling Order, the Academy's deadline to identify any additional domain names was 60 days before the discovery cut-off date.  See Oct. 5, 2010 Minute Order (docket no. 15).  Thereafter, the Court accepted the parties' stipulation continuing pretrial and trial deadlines.  See June 9, 2011 Order (docket no.95).  This Order continued the deadline by which the Academy was to disclose additional infringing domain names to a specific date – September 14, 2011.  Thereafter, the parties again stipulated to continue certain dates, and the Court accepted the parties' stipulation.  See Sept. 27, 2011 Order (docket no. 150). This final schedule, however, did not continue the Academy's deadline for identifying additional domain names.  The operative deadline for the Academy to disclose additional names was therefore September 14, 2011.  During their meet and confer process surrounding the second

RJN - Ex. A 13

1  stipulation, the parties evidently discussed whether to extend the

2  Academy's deadline to disclose additional domains. See McKown Decl.

3  ISO GoDaddy's Opp'n, Exhs. A, B.  The Academy also evidently

4  recognized that the stipulation submitted to the Court did not extend

5  its deadline to disclose because the Academy informed GoDaddy that it

6  reserved its right to ask the Court to extend the deadline. Id.  If

7  the stipulation as submitted did not accurately reflect the parties'

8  agreement, the Academy could have promptly sought relief from the

9  Court.  Similarly, if the parties could not agree about this deadline,

10 the Academy could have filed a motion asking the Court to extend it.

11 But the Academy did not seek relief from the order that was entered,

12 and the Court will not grant relief from that order at summary

13 judgment.  Thus, the operative deadline was September 14, 2011.

14 Accordingly, domain names that the Academy disclosed after September

15 14, 2011 were not timely disclosed so they are not at issue

16 **B.   The Academy's Cybersquatting Claim**

17       Congress enacted the ACPA on November 29, 1999, to "protect

18 consumers and American businesses, to promote the growth of online

19 commerce, and to provide clarity in the law for trademark owners by

20 prohibiting bad-faith and abusive registration of distinctive marks as

21 Internet domain names with the intent to profit from the goodwill

22 associated with such marks." Sporty's Farm L.L.C. v. Sportsman's

23 Market, Inc., 202 F.3d 489, 495 (2d Cir. 2000) (quoting S.Rep. No.

24 106-140, at 4 (1999)).

25       In pertinent part, the ACPA provides,

26            A person shall be liable in a civil action by the
             owner of a mark . . . if, without regard to the
27           goods and services of the parties, that person (i)
             has a bad faith intent to profit from that mark . .
28           .; and (ii) registers, traffics in, or uses a

                                    9

domain name that-

> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
>
> (II) in the case of a famous mark that is famous at the time of the registration of the domain name, is identical or confusingly similar to or dilutive of that mark;. . .

15 U.S.C. § 1125(d)(1)(A).

Thus, to prevail on an ACPA claim, a plaintiff must prove the following four elements: (1) the plaintiff's mark is distinctive or famous; (2) the accused domain name is identical or confusingly similar to the plaintiff's mark, or, if the mark is famous, the domain name is dilutive of the mark; (3) the defendant registered, trafficked in, or used the accused domain name; and (4) the defendant acted with bad faith. See Sporty's Farm, 202 F.3d at 497-99.

### 1. The Academy's Marks are Distinctive; Whether the Academy's Marks are Famous is a Triable Issue of Fact.

Marks registered with the United States Patent and Trademark Office are presumptively distinctive. 15 U.S.C. § 1115(a). It is undisputed that all five of the Academy's marks are registered with the USPTO. GoDaddy makes no attempt to rebut this presumption. As such, the Academy's marks are distinctive.

A mark is "famous if it is widely recognized by the general consuming public of the United States." 15 U.S.C. § 1125(c)(2)(A). The Lanham Act provides a non-exclusive list of four factors that a court can assess to determine whether a mark is sufficiently recognized to be famous:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

10

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

Id.

Having reviewed the evidence in light of the foregoing factors, the Court finds that whether the Academy's five marks are famous is a triable issue of fact.

**2.   GoDaddy is Not Entitled to 15 U.S.C. § 1114(2)(D)(iii)'s Safe Harbor.**

The Academy also argues that, as a matter of law, GoDaddy is not entitled to ACPA's safe harbor provision for domain name registrars. That provision creates immunity for "[a] domain name authority" from claims for damages "for the registration or maintenance of a domain name for another absent a showing of bad faith intent to profit from such registration or maintenance of the domain name." 15 U.S.C. § 1114(2)(D)(iii). As the Court noted in its September 20, 2010 Order resolving GoDaddy's Motion to Dismiss, this provision shelters only those registrars acting solely in the "registration" or "maintenance" capacity; registrars are not immunized from liability for conduct that goes beyond mere registration and maintenance of domain names. See Sept. 20 Order (docket no. 51), 8:23-10:15. GoDaddy argues that the safe harbor provision "appl[ies] to at least some of GoDaddy's alleged conduct." Opp'n 10:7-9. But, the Academy stresses that its motion "is limited to the activity related to the Parked Pages Program." Reply 14, fn. 11. The undisputed facts show that, with regard to its operation of the Parked Pages Program, GoDaddy does not function solely as a registrar. First, the Parked Pages Program applies to

11

pages already registered with GoDaddy, indicating that GoDaddy has
fulfilled its registration role by the time it implements the parking
programs.  The Parked Pages Program is  distinct from GoDaddy's
registrar function.  Fact 5.  Second, through its Parked Pages
Program, GoDaddy uses its servers to create webpages for registered
domain names, and to place advertising on those pages for which it can
collect a fee-per-click.  Facts 9, 13, 17.  Creating webpages, placing
ads, and collecting ad revenue is not registration activity.

GoDaddy contends that it is still entitled to safe harbor
protection because the Academy has not shown that it has in fact
received revenues from ads placed on webpages resolved from the
accused domain names.  This position is unavailing.  The safe harbor
provision immunizes only (1) registration or maintenance, (2) "absent
a showing of bad faith intent to profit."  The safe harbor provision
simply does not apply to conduct, like operating the Parked Pages
Program, that goes beyond mere registration and maintenance.
Furthermore, a registrar's mere bad faith *intent* to profit – as
opposed to actual profit – is sufficient to disqualify it from safe
harbor protection.  For these reasons, GoDaddy is not entitled to the
safe harbor provision of § 1114(2)(D)(iii) for its Parked Pages
Program.

**3.**  **Through its Parked Pages Program, GoDaddy "Uses" and
"Traffics In" Domain Names.**

The ACPA imposes liability for "register[ing], traffic[king] in,
or us[ing]" a domain name that is identical to or confusingly similar
to a distinctive mark.  15 U.S.C. § 1125(d)(1)(A).  The disjunctive
"or" shows that only one type of conduct is sufficient to establish
liability.

12

The Academy argues that, as a matter of law, GoDaddy has "used" and "trafficked in" the accused domain names in its Parked Pages Program.

### a. GoDaddy is an "Authorized Licensee."

ACPA imposes liability upon persons who "use" a domain name that is confusingly similar to another's mark "only if that person is the domain name registrant or that registrant's authorized licensee." 15 U.S.C. § 1125(d)(1)(D).

It cannot be reasonably disputed that GoDaddy was authorized by the domain name registrants to place advertising on webpages resolved from their domain names, and that GoDaddy was therefore an authorized licensee for that purpose. Facts 6-9. GoDaddy argues this point at length, but none of its arguments is availing. Pursuant to the DNRA that they assent to when registering a domain name with GoDaddy, all registrants consent to GoDaddy's placement of advertising on their parked pages and to GoDaddy's receipt and retention of any revenue obtained from such advertising. Although this aspect of the agreement between GoDaddy and its registrants may not be identified in the agreement by the label "license," it is a license in function.

GoDaddy relies primarily on Crabb v. GoDaddy.com, Inc., CV10-00940-PHX-NVW, 2011 WL 4479043 (D. Ariz. 2011) for its rather strange argument to the contrary, that is, that GoDaddy is not an authorized licensee.[3] But Crabb is readily distinguishable. First, Crabb concerned a previous version or versions of the DNRA and related agreements, so it simply is not relevant to the discussion here. As

---

[3] GoDaddy's argument is strange because it would mean that GoDaddy is not authorized to place ads on parked web pages, conduct that could expose it to liability.

13

noted above, it is undisputed that all registrants are bound by the

January 2009 version of the DNRA, and that that DNRA contains language

by which registrants authorize GoDaddy to point their domain names to

GoDaddy pages that may incorporate advertising.  Facts 6-9.

Second, <u>Crabb</u> is distinguishable based on the claims in issue.

There, the plaintiff, a domain name registrant, sued GoDaddy for

placing ads on his webpages on the ground that he did not authorize

GoDaddy to do so.  GoDaddy argued, contrary to its present position,

that through the DNRA and other agreements incorporated in the DNRA,

the plaintiff-registrant did grant it a license to use the domains as

advertising space.  Construing the agreements against the drafter –

GoDaddy – the court ruled that the key authorizing language was not

unequivocally incorporated into the agreement between GoDaddy and the

plaintiff and that therefore the plaintiff did not authorize GoDaddy

to place ads on the plaintiff's registered domain names.  <u>Crabb</u>, 2011

WL 4479043 at *3-4.  That conclusion does not apply here because the

current agreement does incorporate the license language.  Furthermore,

the dispute here is between GoDaddy and a non-party to the agreement,

so the rule that ambiguities in an agreement should be construed

against the drafter – a rule that ordinarily applies to disputes

between parties to an agreement – simply does not apply.

> **b.  GoDaddy "Uses" and "Traffics In" Domain Names in its Parked Pages Program.**

The Academy's ACPA claim, whether it is for use or trafficking,

turns on whether a particular accused domain name is in the Parked

Pages Program.  As the Court noted in the September 20, 2010 Order,

the Program as described in the Academy's complaint is sufficient to

demonstrate use and trafficking.  And, based on the undisputed facts,

RJN - Ex. A 19

the Parked Pages Program does function substantially as alleged.  The

Parked Pages Program creates webpages from which GoDaddy can generate

advertising revenue.  When an internet user attempts to access a

domain name in GoDaddy's Parked Pages Program for which the registrant

has not specified a different server, GoDaddy's parked page servers

create an ephemeral webpage with paid advertising links.  Facts 11-13.

GoDaddy receives revenue any time a user clicks an advertisement on

those parked pages.  Facts 14-16.  This is "use" within the meaning of

the APCA.

The ACPA defines "trafficking in" to mean "transactions that

include, but are not limited to, sales, purchases, loans, pledges,

licenses, exchanges of currency, and any other transfer for

consideration or receipt in exchange for consideration."  15 U.S.C. §

1125(d)(1)(E).  As discussed above, through the DNRA, GoDaddy's

registrants granted GoDaddy a license to place ads on their parked

webpages and retain the resulting revenue.  GoDaddy is therefore an

authorized licensee of its registrants, and therefore is involved in

"transactions that include . . . licenses. . ."  GoDaddy therefore

traffics in those domain names as to which it is an authorized

licensee.

GoDaddy argues that the Academy cannot show "use" or

"trafficking" as to 68 domain names because there is no evidence that

these names were actually routed to the parked page server.  As to

another 169 names that *were* routed to the parked page server, GoDaddy

contends that there is no evidence that it or its affiliates actually

placed ads on the parked pages.  See Mot. 11:18-12:25.

First, concurrent with this Order, the Court is issuing another

Order extending the discovery deadline as to the Academy's witness Joe

15

1  Presbrey.  The evidence is likely to bear on whether the above-
2  referenced domain names were routed to GoDaddy's parked page server
3  and whether advertisements were placed on the parked pages.

4  Second, in any event, GoDaddy's legal argument is not convincing.
5  As the Court understands it, GoDaddy's argument is that, unless a
6  domain name in its Parked Pages Program is actually resolved to a
7  parked webpage  (which happens when an internet user enters that
8  domain name into an internet browser), and an internet user actually
9  clicks on an ad to create revenue for GoDaddy, GoDaddy has not "used"
10 the domain name.  In the Court's view, by placing domain names in the
11 Parked Pages Program, GoDaddy has acted affirmatively and done
12 something with the domain names other than mere passive registration
13 or routing: GoDaddy placed the domain names in a program it designed
14 to make revenue.  This is sufficient to establish "use" even absent
15 actual monetization.

16 As for trafficking, ACPA requires only that a defendant have
17 engaged in a transaction that includes a license and consideration; it
18 is undisputed that in exchange for consideration, GoDaddy received
19 from registrants a license to place revenue-generating ads on webpages
20 resolved from domain names in its Parked Pages Program.  This is
21 sufficient to constitute "trafficking" even absent actual
22 monetization.  If any accused domain name has not been visited by an
23 internet user or did not generate actual revenue for GoDaddy, that may
24 go to damages, but not to liability.

25 Finally, GoDaddy's contention that it is merely routing domain
26 names is unsupported by the facts.  Through its Parked Pages Program,
27 GoDaddy creates and hosts websites to which the accused names resolve,
28 and places revenue-generating advertisements thereon.

RJN - Ex. A 21

For the foreging reasons, the Court finds that GoDaddy's Parked Pages Program allows it to "use" and "traffic in" domain names.

### c. The Court Defers Ruling on Whether the Accused Domain Names are in the Parked Pages Program.

On the present record, the Academy has not demonstrated that the accused domain names are in fact in the Parked Pages Program. Although the Academy contends that GoDaddy "concedes that there is evidence that it monetized, or attempted to monetize, 80 of 317 infringing domain names," Reply 16:26-27, neither the Academy nor GoDaddy has identified these 80 domain names in any list. Nor has the Academy shown that any of the 115 names as to which the Academy is moving are in the Parked Pages Program. The Academy expected to rely on screen shots prepared by its litigation consultant Joe Presbrey to demonstrate that the 115 accused domain names are in the Parked Pages Program. But because the Academy did not timely disclose Mr. Presbrey, the Court cannot consider his declaration or the exhibits he purported to authenticate. In an Order issued concurrently with this one, the Court is extending the discovery deadline to allow the Academy to cure this error and, accordingly, to allow GoDaddy to depose Presbrey. Thus, the Court will not yet reach this question but instead will wait until the evidence is properly disclosed, developed, and presented.

### 4. The Court Defers Ruling on Whether the Accused Domain Names are "Confusingly Similar" to the Academy's Marks.

The parties ask the Court to determine whether certain domain names either are, or are not, identical or confusingly similar to the Academy's marks as a matter of law. The Academy has identified 115 domain names that it claims are confusingly similar as a matter of law. See Michaels Decl. Exh. 1 (last three pages). GoDaddy argues

RJN - Ex. A 22

that a number of domain names are not confusingly similar as a matter of law; these domain names are listed in Appendices 4-6 of GoDaddy's Motion.

To be clear, "[t]he question under the ACPA is not whether the [accused] domain names . . . are likely to be confused with a plaintiff's *domain name*, but whether they are identical or confusingly similar to a plaintiff's *mark*." <u>Coca-Cola Co. v. Purdy</u>, 382 F.3d 774, 783 (8th Cir. 2004) (emphasis in original).

The parties present somewhat different legal standards for how to evaluate "confusingly similar." As per the statute's language, "confusingly similar" should be determined "without regard to the goods and services of the parties."

There is no dispute that "'[c]onfusingly similar' is a different standard from the 'likelihood of confusion' standard for trademark infringement." <u>Sporty's Farm.</u>, 202 F.3d at 498 n. 11 (citing <u>Wella Corp. v. Wella Graphics, Inc.</u>, 37 F.3d 46, 48 (2d Cir. 1994)). There is also no dispute that the ACPA "confusingly similar" analysis entails a direct comparison between the domain name and the mark. As a result, for example, even if it might be evident from the content of the website that it is not affiliated with the plaintiff, there may nonetheless be a violation of the ACPA. <u>See</u> <u>People for Ethical Treatment of Animals v. Doughney</u>, 263 F.3d 359 (4th Cir.2001) (holding that domain name www.peta.org violated the ACPA because it was identical to the mark of the plaintiff, People for the Ethical Treatment of Animals, even though a visit to the site itself revealed that it was a parody and that the initials "peta" stood for People Eating Tasty Animals).

However, the parties appear to disagree over whether the direct

RJN - Ex. A 23

or facial comparison the court must make means the court should make

only a "facial comparison of the domain name to the mark," <u>DISC</u>

<u>Intellectual Properties LLC v. Delman</u>, 2007 WL 4973849, at *5 (C.D.

Cal. 2007), or whether it should "compar[e] . . . plaintiff's marks

and defendants' domain names, including their intrinsic sound, sight,

and meaning. . ."  <u>Omega S.A. v. Omega Eng'g, Inc.</u>, 228 F. Supp. 2d

112, 127 (D. Conn. 2002).

In the Court's view a "facial comparison" and comparing sight,

sound, and perhaps meaning, are not different approaches.  To perform

a "facial comparison" between a domain name and a mark, one must

specify the qualities of the domain name and mark that one is

comparing.  Accordingly, some cases – and the leading treatise – note

that a direct, facial comparison between a domain name and a mark

entails an examination of whether the domain name and mark are similar

in sight, sound, and/or meaning.[4]  <u>See, e.g.</u>, J. Thomas McCarthy,

McCarthy on Trademarks and Unfair Competition § 25:78(4th ed. 2002)

("In the cybersquatting context, 'confusingly similar' must simply

mean that the plaintiff's mark and the defendant's domain name are so

similar in sight, sound, or meaning that they could be confused.").

_____

[4]  These three elements comprise the test for similarity of the marks element of the *Sleekcraft* test for likelihood of confusion applied to traditional trademark infringement claims.  <u>See AMF Inc. v. Sleekcraft Boats</u>, 599 F.2d 341, 351 (9th Cir. 1979) abrogated on other grounds by <u>Mattel, Inc. v. Walking Mountain Prods.</u>, 353 F.3d 792 (9th Cir. 2003) ("Similarity of the marks is tested on three levels: sight, sound, and meaning.")  Although it appears to the Court that a comparison of sight and sound is consistent with ACPA's directive that confusingly similar be determined without regard to the goods and services of the parties, comparing meaning may in some instances be inconsistent with that directive because meaning requires context, which may entail comparing goods and services.

RJN - Ex. A 24

Under this test, "slight differences between domain names and registered marks, such as the addition of minor or generic words to the disputed domain names are irrelevant." Omega S.A., 228 F. Supp. 2d at 128-29. Similarly, the addition or removal of punctuation do not render a domain name dissimilar from a mark. Super-Krete Intern., Inc. v. Sadler, 712 F. Supp. 2d 1023, 1032 (C.D. Cal. 2010).

Based upon the foregoing principles, courts have ruled as follows:

- that "sportys.com" is confusingly similar to "sporty's" under the ACPA, see Sporty's Farm, 202 F.3d at 498;

- that the domain names "OMEGATIME" and "OMEGAWATCH" are confusingly similar to the marks "omega" or "O", see Omega S.A., 228 F. Supp. 2d at 127;

- that "ctvoices.com" is confusingly similar to the mark "Voices," see Prime Publishers, Inc. v. American-Republican, Inc., 160 F. Supp. 2d. 266, 277 (D. Conn. 2001) (stating, "[w]e do not believe the Defendant's addition of a generic or geographic term such as 'ct' is sufficient to distinguish the domain name from Plaintiff's protected mark. . .");

- that "barbiesplaypen.com" is confusingly similar to the mark "Barbie" because "1) both contain the name 'barbie'; 2) the name 'Barbie' on the front page of the web site and the logo BARBIE both have approximately the same font, slant, size, etc.; 3)and both BARBIE and 'barbiesplaypen.com' are inextricably associated with the verb 'play' in the broad sense of the term," see Mattel, Inc. v. Internet Dimensions, 2000 WL 973745, at *3 (S.D.N.Y. 2000);

- that domain names using "harrodsbank," "harrodsbanking,"

20

"harrodsstore," and "harrodsshopping" are confusingly
similar to the "Harrods" mark because they bore "a visual
resemblance to the Harrods mark," see Harrods Ltd. v. Sixty
Internet Domain Names, 157 F. Supp. 2d. 658, 677–78 (E.D.
Va. 2001);

- that allegation that "4fordparts.com" and "4fordtrucks.com"
  are confusingly similar to the "Ford" mark is sufficient to
  overcome Rule 12(b)(6) motion to dismiss, see Ford Motor Co.
  v. Greatdomains.Com, Inc., 177 F. Supp. 2d. 635, 641 (E.D.
  Mich. 2001);

- that domain names "my-washingtonpost," "mymcdonalds," and
  "drinkcoke" with various top-level domain suffixes are
  confusingly similar to the "Washington Post," "McDonald's,"
  and "Coke" marks, see Coca-Cola Co., 382 F.3d at 784; and

- that "supercrete.com" is confusingly similar to the mark
  "Super-Crete," see Super-Krete Int'l, 712 F. Supp. 2d at
  1032.

The briefing and the cases do reflect a genuine disagreement
concerning the extent to which the addition of other words or text to
a trademark can distinguish an accused domain name from the mark. The
following passage from Ford reflects a position that GoDaddy favors:
"This court similarly concludes that, unless words or letters added to
the plaintiff's mark within the domain name clearly distinguish it
from the plaintiff's usage, allegations that a domain name
incorporates a protected mark generally will suffice to satisfy the
'identical or confusingly similar to' requirement." Ford Motor, 177
F. Supp. 2d at 642. The Court then provided the following example:
"[t]he domain name 'fordstheatre.org' – the homepage of the renowned

21

Ford's Theatre in Washington, D.C. - incorporates the FORD mark with the addition of the generic word 'theatre' but, from its context, is not 'confusingly similar to' the FORD mark.  No reasonable person could conclude that such a site was 'used or approved' by the Ford Motor Company."  <u>Id.</u> at 642, fn. 3.

This approach, broadly interpreted, is inconsistent with ACPA's command that confusing similarity must be assessed "without regard to the parties' goods or services," because the distinction it makes turns precisely on the difference between the parties' goods or services.  <u>Accord</u> <u>Omega S.A.</u>, 228 F. Supp. 2d at 128 (disagreeing with <u>Ford</u> on this basis).  However, there may be instances where the meaning of the words used in a domain name and the meaning of a plaintiff's mark can be ascertained without regard to the parties' actual goods or services.  In such instances, considering meaning when determining confusing similarity may be consistent with ACPA.

In short, the Court finds that, for purposes of assessing confusing similarity under ACPA, it must perform a direct comparison between the accused domain name and the plaintiff's trademark; this comparison may include consideration of sight, sound, and, to a more limited extent, meaning.

The Court will now characterize the categories of domain names as to which the parties seek summary adjudication.

The 115 names the Academy moved on consist of the Academy's exact trademarks, with the addition of other, primarily generic, terms.

GoDaddy moves the Court to rule that several different sets of domain names are not confusing as a matter of law, specifically, those domain names listed in Appendices 4, 5, and 6 of its Motion.  (GoDaddy has not indicated how many domain names are in each of its lists, and

RJN - Ex. A 27

neither party has indicated whether GoDaddy's lists overlap with each other or with the Academy's 115-domain name list.) For the domain names listed in GoDaddy's Appendices 4 and 5, GoDaddy relies on the reports of its experts Geoffrey Nunberg and Carol Scott to demonstrate these names are not confusing. In its concurrently-issued Order, the Court is excluding these experts' reports and testimony at trial. As to the domain names listed in Appendix 6, GoDaddy contends they are not similar based on what the registrant intended the domain name to refer to, and that none of the registrants meant their domain names to refer to the Academy's marks. For example, the registrant of oscarramirez.com states that the domain name refers to his own first and last names, Oscar Ramirez. Similarly, the registrant of theoscars.co states that the domain name "[r]efers to oscar fish." See Mot. Appx. 6. Assuming that the registrants of these domain names intended the names to refer to something other than the Academy's marks, that fact is not relevant to whether the marks are confusingly similar under ACPA. As discussed above, this determination is made by comparing the domain names to the marks, and may take account of sight, sound, and to a certain extent meaning, but without other context. Thus, whether a name is confusingly similar under ACPA must be determined objectively, from the point of view of a consumer, and not based on a particular registrant's subjective intention when he or she selected a name, even if that intention is innocent. See, e.g., Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1060 (9th Cir. 1999) ("Likelihood of confusion is determined on the basis of a 'reasonably prudent consumer.'") (citation omitted).

Nevertheless, a domain name that is clearly a person's proper name is not confusingly similar to the Academy's marks. For example,

on its face, the domain name "oscarramirez.com" is significantly
different from the Academy's OSCAR marks because it includes not only
the letters "oscar," but also the clearly recognizable last name,
"ramirez." Notably, "ramirez" is not a mere generic term appended to
the Academy's mark, so "oscarramirez.com" is not analogous to, for
example, "my-washingtonpost.com." The sight and sound of
"oscarramirez.com" is therefore different from the sight and sound of
OSCAR. As to meaning, a proper name has no meaning except to refer to
its bearer. To the extent oscarramirez.com has meaning, that meaning
is self-evident: it is a person's name registered as a domain name.
As such, whatever meaning oscarramirez.com has, that meaning is not
confusingly similar to the meaning of the Academy's marks.

As for whether any of the domain names as to which the parties
move are, or are not, confusingly similar as a matter of law, the
Court will refrain from ruling until the parties present the Court
with a unified list.

**5.    There is No Genuine Issue of Fact as to Whether GoDaddy is
the Registrant of Three Accused Domains because those Three
Domains Names were Not Timely Disclosed.**

GoDaddy argues that it cannot be held liable as a registrant
because the Academy has no evidence that it is the registrant – that
is, that it owns – any of the domain names. The Academy contends that
there is a genuine issue as to whether GoDaddy is the registrant as to
three names: 2006AcademyAwards.com, AcademyAwardsShow.com, and
TheAcademyAwardsLive.com. See Opp'n 24:20-23. However, the Academy
disclosed these three names on March 8, 2013, after September 14, 2011
deadline. See GoDaddy's Mot. Appx. 1 (last page). As such, the
Academy did not timely disclose these domain names, so they are not at
issue. Accordingly, there is no genuine issue of fact as to whether

RJN - Ex. A 29

1  GoDaddy is a registrant of any of the names at issue.

2  **6.   ACPA's "Dilutive" Prong Does Not Require Actual Dilution.**

3  GoDaddy argues that the Academy's claim in so far as it is based

4  on the accused domain names being "dilutive of" the Academy's marks

5  fails because the ACPA requires actual dilution and the Academy has no

6  evidence of actual dilution.  The statute imposes liability for domain

7  names that are "dilutive of that [famous] mark."  <u>See</u> 15 U.S.C. §

8  1125(d)(1)(A)(ii)(II).  Thus, to decide this aspect of GoDaddy's

9  motion, the Court must determine whether "dilutive of" means

10 "dilutes."

11     To ask the question is to answer it.  Had Congress intended to

12 require actual dilution, the statute would have imposed liability for

13 domain names that "dilute that mark," rather than for domain names

14 that are merely "dilutive of that mark."  According to the Oxford

15 English Dictionary, the suffix "-ive" means "having a tendency to,

16 having the nature, character, or quality of, given to (some action)."

17 <u>See</u> Oxford English Dictionary Online,

18 http://www.oed.com/view/Entry/100370?redirectedFrom=-ive#eid <last

19 visited June 19, 2013>.  Thus, the statute imposes liability for

20 domain names that have a tendency to dilute a famous mark.  One could

21 argue about how strong that tendency to dilute must be before

22 liability attaches, but the statute does not require actual dilution.

23     GoDaddy argues that the Ninth Circuit has already resolved this

24 issue in <u>Bosley Med. Inst., Inc. v. Kremer</u>, 403 F.3d 672 (9th Cir.

25 2005), wherein it "construed the phrase 'dilutive of' to mean

26 'dilutes,' i.e., actual dilution."  <u>See</u> Mot. 20:21-23.  This argument

27 is not convincing.  In <u>Bosley</u>, the Ninth Circuit used the word

28 "dilutes" to paraphrase.  Specifically, rather than fully quote ACPA's

RJN - Ex. A 30

elements (iii)(I) and (II), which read "(ii) registers, traffics in, or uses a domain name that– (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark," the Court instead paraphrased them with the language "a domain name [that is confusingly similar to another's mark or dilutes another's famous mark]." <u>Bosley</u>, 403 F.3d at 680. While it is true that, in its paraphrase, the Ninth Circuit replaced "dilutive of" with "dilutes," it did so without discussion and without expressly holding that dilutive means actual dilution. Indeed, <u>Bosley</u>'s discussion of ACPA concerned only whether the ACPA has a commercial use requirement; it did not purport to construe the phrase "dilutive of." The Court cannot accord the Ninth Circuit's casual paraphrasing of a statute, in dicta, the precedential value GoDaddy argues for.

## C. Academy's Contributory Cybersquatting Claim

GoDaddy moves for summary judgment on the Academy's contributory cybersquatting claim. This claim concerns GoDaddy's Cash Parking Program. In the Cash Parking Program, domain name registrants pay GoDaddy a fee to register a domain name; revenue from ads placed on those webpages is split among the registrant, GoDaddy, and GoDaddy's advertising partner. Fact 14. GoDaddy creates and hosts the webpages to which domain names in the Cash Parking Program that have not been designated a different server resolve, and places content (advertisements) on those webpages. Fact 17. GoDaddy argues that it cannot be liable for contributory cybersquatting based on its operation of the Cash Parking Program because there is no evidence

RJN - Ex. A 31

1   that registrants of the disputed domain names actually used GoDaddy's

2   "name spinning technology"[5] when they registered the names.

3       The Court addressed the elements of contributory

4   cybersquatting in its September 6, 2011 Order granting the

5   Academy's Motion to Amend:

6       A person is liable for contributory trademark
        infringement when he or she "either intentionally induces
7       a third party to infringe the plaintiff's mark or
        supplies a product to a third party with actual or
8       constructive knowledge that the product is being used to
        infringe the service mark." Lockheed Martin Corp. v.
9       Network Solutions, Inc., 194 F.3d 980, 983 (9th Cir.
        1996). Because contributory liability for a domain name
10      registrar implicates a service, and not a product, the
        Court must consider "the extent of control exercised by
11      the defendant over the third party's means of
        infringement." Id. at 984. Thus, under the "extent of
12      control" theory at issue here, "[f]or liability to
        attach, there must be '[d]irect control and monitoring of
13      the instrumentality used by a third party to infringe the
        plaintiff's mark.'" Perfect 10, Inc. v. Visa Int'l Serv.
14      Ass'n, 494 F.3d 788, 807 (9th Cir. 2007) (quoting
        Lockheed Martin, 194 F.3d at 984; alteration in
15      original); see also Solid Host, NL v. Namecheap, Inc.,
        652 F. Supp. 2d 1092, 1112. In the specific context of
16      the ACPA, to be liable for contributory liability, a
        defendant must have known or have had reason to know that
17      the direct cybersquatter was acting in bad faith; this
        can be demonstrated by the existence of "exceptional
18      circumstances." Ford Motor Co. v. Greatdomains.com,
        Inc., 177 F. Supp. 2d 635, 647 (E.D. Mich. 2001).

19  Sept. 6, 2011 Order (docket no. 138), p. 4.

20      The Academy does not have to prove that a registrant actually

21  relied on GoDaddy's "name spinning technology" to select an accused

22  domain name, because that technology is not the only way in which

23  GoDaddy is accused of "induc[ing]" infringement or "suppl[ying] a

24  product [or service] to a third party. . ." For example, GoDaddy's

25

26  ─────────────

27      [5] GoDaddy's name spinning technology suggests alternative domain
    names if the domain name the registrant wishes to register is already
28  taken.

RJN - Ex. A 32

Cash Parking Program may be said to "induce" infringement, independent
of the name spinning technology, because it offers potential
registrants the opportunity to monetize an infringing name even where
the name spinning technology does not provide the name.  In addition,
GoDaddy supplies a service that the registrants use for their alleged
direct cybersquatting because GoDaddy creates the parked webpages and
places advertisements on them.  Nor must the Academy depose each and
every registrant to determine his or her bad faith intent to profit
because intent may be inferred from other evidence.  Accordingly, this
aspect of GoDaddy's Motion is **DENIED**.


                              **V.   CONCLUSION**

     For the foregoing reasons, the Court rules as follows:

- Domain names that the Academy disclosed after September 14, 2011
  are not at issue.

- The Academy's marks are distinctive; whether the Academy's marks
  are famous is a triable issue of fact.

- GoDaddy is not entitled to 15 U.S.C. § 1114(2)(D)(iii)'s safe
  harbor.

- As to whether GoDaddy's conduct constitutes "using" and
  "trafficking in" domain names:

  - GoDaddy is an "Authorized Licensee" for purposes of ACPA
    liability.

  - GoDaddy "uses" and "traffics in" domain names in its Parked
    Pages Program.

  - The Court defers ruling on whether the accused domain names
    are in the Parked Pages Program.

RJN - Ex. A 33

1 • The Court defers ruling on whether the accused domain names are

2 "confusingly similar" to the Academy's marks.

3 • GoDaddy is not liable under ACPA as a registrant

4 • ACPA's "dilutive" prong does not require actual dilution.

5 • GoDaddy's Motion for Summary Judgment is **DENIED.**

6

7 **IT IS SO ORDERED.**

8 **DATED: June 21, 2013**

_____

9 **AUDREY B. COLLINS**
**UNITED STATES DISTRICT JUDGE**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

1

2

3

4

5

6

7

8

9                     UNITED STATES DISTRICT COURT

10                    CENTRAL DISTRICT OF CALIFORNIA

11                           WESTERN DIVISION

12

13   ACADEMY OF MOTION PICTURES ARTS        CV 10-3738 ABC (CWx)
     AND SCIENCES, a California Non-
14   Profit Corporation;                    ORDER RE: DEFENDANTS'
                                            GODADDY.COM, INC. AND DOMAINS
15                       Plaintiff,          BY PROXY, INC.'S MOTION TO
                                            DISMISS FIRST AMENDED
16            v.                             COMPLAINT, OR, IN THE
                                            ALTERNATIVE, TO STRIKE
17   GODADDY.COM, INC, a Delaware
     Corporation; THE GODADDY GROUP,
18   INC., a Delaware Corporation,
     DOMAINS BY PROXY, INC., a
19   Delaware Corporation,
     GREENDOMAINMARKET.COM, an
20   unknown entity; BDS, an unknown
     entity; XPDREAMTEAM, LLC, a
21   California Limited Liability
     Corporation;
22
                         Defendants.
23

24        Pending before the Court is a Motion to Dismiss Plaintiff's First

25   Amended Complaint, or In the Alternative, Motion to Strike ("Motion"),

26   filed by Defendants GoDaddy.com, Inc., and Domains By Proxy, Inc.

27   ("Defendants"), on November 6, 2010.  On November 19, 2010, Plaintiff

28   Academy of Motion Pictures Arts and Sciences ("Plaintiff") filed its

Opposition, and on December 6, 2010, Defendants filed their Reply.
The Court finds this Motion appropriate for resolution without oral
argument and **VACATES** the hearing set for December 20, 2010.  Fed. R.
Civ. P. 78; Local Rule 7-15.  For the reasons below, the Motion is
**DENIED**.


### I.   PROCEDURAL BACKGROUND

The factual background of this case is set forth at length in the
Court's September 20, 2010 Order ("Order," docket no. 51) on
Defendants' first Motion to Dismiss.  Therein, the Court dismissed
certain of Plaintiff's claims with leave to amend.  On October 12,
2010, Plaintiff filed its First Amended Complaint ("FAC") amending its
claims under California Business & Professions Code § 17200 et seq.
("UCL") for unfair conduct and unlawful conduct, claims 2 and 3
respectively.  In the instant Motion, Defendants argue that these re-
pled claims must be dismissed under Fed. R. Civ. P. 12(b)(6) because
Plaintiff lacks standing to bring them and, in the alternative, that
the unfair conduct claim is otherwise inadequately pled.  Defendants
also move in the alternative, under Fed. R. Civ. P. 12(f), to strike
Plaintiff's prayer for restitution.


### II.   DISCUSSION

**A.   Legal Standard for a Rule 12(b)(6) Motion to Dismiss**

The Supreme Court has recently clarified the level of pleading
necessary to survive a motion to dismiss under Rule 12(b)(6).  See
Ashcroft v. Iqbal, __ U.S. __, __, 129 S. Ct. 1937, 1950-52 (2009);
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557-58 (2007).  Federal Rule
of Civil Procedure 8(a)(2) requires a "short and plain statement of

RJN - Ex. B 37

the claim showing that the pleader is entitled to relief," which does not require "detailed factual allegations," but it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Iqbal</u>, __ U.S. at __, 129 S. Ct. at 1949. A claim must be "plausible on its face," which means that the Court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u>; <u>see</u> <u>Twombly</u>, 550 U.S. at 556, 570. In other words, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555 (internal quotations and alterations omitted). Allegations of fact are taken as true and construed in the light most favorable to the nonmoving party. <u>See</u> <u>Newdow v. Lefevre</u>, 598 F.3d 638, 642 (9th Cir. 2010).

In analyzing the sufficiency of the complaint, the Court must first look at the requirements of the causes of action alleged. <u>See</u> <u>Iqbal</u>, __ U.S. at __, 129 S. Ct. at 1947. The Court may then identify and disregard any legal conclusions; they are not subject to the requirement that the Court must accept as true all of the allegations contained in the complaint. <u>Id.</u> at __, 129 S. Ct. at 1949. The Court must then decide whether well-pleaded factual allegations, when assumed true, "plausibly give rise to an entitlement to relief." <u>Id.</u> at __, 129 S. Ct. at 1950. In doing so, the Court may not consider material beyond the pleadings, but may consider judicially noticeable documents, documents attached to the complaint, or documents to which the complaint refers extensively or which form the basis of the plaintiff's claims in the complaint. <u>See</u> <u>United States v. Ritchie</u>, 342 F.3d 903, 908 (9th Cir. 2003).

RJN - Ex. B 38

**B.** **The FAC's Allegations Are Sufficient to Confer Standing on Plaintiff to Bring Its UCL Claims**.

Defendants argue that Plaintiff has pled insufficient facts to demonstrate that it has standing to pursue its second and third claims, for unfair conduct and unlawful conduct respectively, under the UCL. To have standing to bring a UCL claim, a plaintiff must allege that it (1) "has suffered injury in fact," and (2) "has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204; <u>Californians For Disability Rights v. Mervyn's, LLC</u>, 39 Cal. 4th 223, 228 (2006). The Court incorporates by reference its discussion of the UCL's standing requirement from its September 20, 2010, Order. <u>See</u> Order, pp. 16-21.

Here, Plaintiff asserts two distinct injuries: (2) dilution of its trademarks, and (2) costs incurred to police Defendants' alleged misuse of the trademarks. FAC ¶¶ 25, 37. Defendants contend that, even assuming these are "injuries in fact," Plaintiff has not alleged how these injuries were caused "as a result of" the alleged misconduct.

Having reviewed the FAC, the Court finds that Plaintiff has pled facts sufficient to show standing. Specifically, Plaintiff alleges that "Defendants' illegal activities *result in advertising related to the Academy's marks* being placed on numerous parked pages that have no actual relationship to the Academy, *thereby causing dilution* of Plaintiff's interest in legally protected trademarks." FAC ¶ 45 (emphasis added). Similarly, "Plaintiff has expended significant time and expense, including in connection with the retention of counsel, in identifying these infringing pages and sending the cease-and-desist

letters." FAC ¶ 45. As to the latter injury, Plaintiff clearly alleges that it has incurred the expense of monitoring Defendants' use of its marks because that use was unauthorized. See also FAC ¶¶ 37, 44.

Defendants assert that Plaintiff's FAC contains insufficient detail because, for example, it fails to identify specific domain name registrations that were the targets of Plaintiff's cease-and-desist letters and fails to assert that all such expenses were the result of policing Defendants' "parking" activity as opposed to it protected registration activity. (Mot. 6:1-11.) However, such detail is not required at the pleading stage; at this point, a plaintiff need only make sufficient – as opposed to comprehensive – factual allegations, and need not proffer evidence. Accordingly, Plaintiff has pled that it has lost money or property as a result of the unfair and unlawful conduct alleged in its FAC. Plaintiff therefore has standing to pursue its UCL claims.

## C. **Plaintiff's UCL Claim for Unfair Conduct Is Sufficiently Pled.**

In its previous Order, the Court rejected Defendants' argument that Plaintiff's UCL claim for unfair conduct was insufficiently pled. In that motion, Defendants argued that although the definition of "unfair" is unsettled, Plaintiff failed to allege facts satisfying any definition of "unfair." In rejecting this argument, the Court noted that Defendants raised it a cursory manner, and concluded that the Complaint satisfied either standard for "unfair." (Order 22:3-22.)

Defendants now assert a variation on their previous argument: emphasizing the distinction between unfair conduct claims brought by *competitors* as opposed to those brought by *consumers*, Defendants contend that Plaintiff brings its claim as a competitor, but has

5

failed to allege that Defendants' conduct is tantamount to a violation of antitrust law, as required pursuant to the seminal case <u>Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.</u>, 20 Cal. 4th 163 (1999).  In <u>Cel-Tech</u>, the Court stated that "[w]hen a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." <u>Cel-Tech</u>, 20 Cal 4th at 187.

However, the <u>Cel-Tech</u> court qualified this reference to antitrust law, stating "[t]his case involves an action by a competitor alleging anticompetitive practices.  Our discussion and this test are limited to that context.  Nothing we say relates to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law such as 'fraudulent' or 'unlawful' business practices or 'unfair, deceptive, untrue or misleading advertising.'" <u>Id.</u> at 187 fn. 12.

Furthermore, as Plaintiff points out, the distinction between competitor claims and consumer claims has no bearing in trademark cases.  In <u>Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.</u>, 944 F.2d 1446, 1457 (9th Cir. 1991) a case involving an Oscar trademark, the Ninth Circuit reversed the district court's dismissal of claim for unfair competition.  Citing <u>Ball v. American Trial Lawyers Ass'n</u>, 14 Cal. App. 3d 289 (1971), the Court stated that "[a]n action for unfair competition under [the UCL] is 'substantially congruent' to a trademark infringement claim under the

1   Lanham Act. [] Under both, the ultimate test is whether the public is

2   likely to be deceived or confused by the similarity of the marks.

3   **[E]ven if the parties are not competitors, injury is established**

4   **[under the UCL] if the public is likely to confuse or associate the**

5   **source of the goods."** <u>Creative House</u>, 944 F.2d at 1457 (emphasis

6   added).

7        Here, the gravamen of Plaintiff's FAC – including the UCL claim

8   for unfair conduct – is that, without Plaintiff's authorization,

9   Defendants are registering, trafficking in, licensing, and using

10  Plaintiff's trademarks in internet domain names to generate revenue

11  for themselves.  (FAC ¶¶ 1-2.)  Plaintiff further alleges that "[b]y

12  diverting consumers from Plaintiff's website to websites accessible

13  from the infringing [domains, Defendants] create[] a likelihood of

14  confusion as to the source, sponsorship, affiliation, or endorsement

15  of the infringing [] websites."  (FAC ¶ 61.)  In so alleging that the

16  public is likely to be confused by Defendants' conduct, the FAC states

17  a claim for "unfair" conduct under the UCL.

18  **D.   <u>The Court Denies Defendants' Rule 12(f) Motion to Strike.</u>**

19       Finally, Defendants urge the Court to strike Plaintiff's prayer

20  for restitution as a remedy for the alleged UCL violations.  <u>See</u> FAC

21  ¶¶ 75 & 81, Prayer for Relief (e)(2).[1]  Defendants urge that the prayer

22  for restitution be stricken because it is inadequately pled.

23       The removal of inadequately pled material is not a proper purpose

24  for a motion to strike.  Rather, Rule 12(f) provides that "the court

25

26  ───────────────

27       [1]  The Court notes that Plaintiff has abandoned its separate

    claim for unjust enrichment and instead merely seeks restitution as a

28  remedy.

                                    7

may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. Proc 12(f). Plaintiff's prayer for restitution cannot be considered "redundant, immaterial, impertinent, or scandalous matter." Indeed, restitution is, in general, an available remedy for UCL violations. See, e.g., MGA Entertainment, Inc. v. Mattel, Inc., 2005 WL 5894689, *9 (C.D. Cal. 2005) (denying motion to strike prayer for restitution for a UCL violation, and stating that, more important than the fact that the remedy would otherwise remain in the complaint under other causes of action, is the fact the restitution and disgorgement can be appropriate remedies under the UCL); and Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1134, 1148-1149 (Cal. 2003) (discussing restitution as a remedy for a UCL violation). Plaintiff's prayer for restitution for its UCL claims therefore survives Defendants' motion.


### III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's First Amended Complaint, or In the Alternative, Motion to Strike, is **DENIED**.

**IT IS SO ORDERED.**

DATED:    December 15, 2010    _____

                             **AUDREY B. COLLINS**
               **CHIEF UNITED STATES DISTRICT JUDGE**

## CERTIFICATE OF SERVICE

Pursuant to L.R. 5-3, I hereby certify that on January 27, 2014, I electronically filed the foregoing document, **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT GODADDY.COM, LLC'S MOTION TO DISMISS AND MOTION TO STRIKE**, with the Clerk of the Court by using the CM/ECF system and that the foregoing document is being served on all counsel of record identified below via transmission of Notice of Eletronic Filing generated by CM/ECF:

Enoch H. Liang
James M. Lee
**Lee Tran & Liang APLC**
601 South Figueroa Street, Suite 3900
Los Angeles, CA 90017

Attorneys for Plaintiff Academy of Motion Picture Arts and Sciences
Phone:  213-612-3737
Fax:  213-612-3773
E-mail: jml@ltlcounsel.com;
ehl@ltlcounsel.com

Stuart Singer
**Boies, Schiller & Flexner LLP**
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301

Phone:  954-356-0011
Fax:  954-356-0022
E-mail:  ssinger@bsfllp.com

David Michels, Esq.
David L. Zifkin, Esq.
**Boies, Schiller & Flexner LLP**
401 Wilshire Blvd., Suite 850
Santa Monica, CA  90401

Phone:  310-752-2400
Fax:  310-752-2490
Email:  dzifkin@bsfllp.com;
dmichaels@bsfllp.com

Robert M. Foote
Kathleen Chavez
Matthew Herman
**Foote, Mielke, Chavez & O'Neil LLC**
10 West State Street, Suite 200
Geneva, IL 60134

Phone:  630-232-6333
Fax:  630-845-8982
E-mail:  rmf@fmcolaw.com;
kchavez@fmcolaw.com;  and
mherman@fmcolaw.com

Executed on January 27, 2014, at Irvine, California.

_____
CARLIE PEISLEY

WRENN BENDER LLLP
2 Park Plaza, Suite 550
Irvine, California 92614